HENRY S. DAVIS *vs.* RICHARD M. HALL.

*Contract for the Sale of Land where the Purchase money is payable in Instalments—Part payment of the Purchase money—Rescission of the Contract—Rights as between Vendor and Vendee—Liability of the Grantee in a Deed, absolute in form, but intended as a Mortgage, for Taxes on the property—Practice in Equity in respect of Remanding a Commission to take testimony.*

Under a contract for the sale of lands where the purchase money is payable in instalments, if the vendee pays part and then rescinds the contract, he cannot recover back what he has paid, the vendor being ready and willing to perform on his part.

But if the vendor be the party who rescinds the contract, he cannot hold on to any part of the consideration he has received under it, and what has been paid may be recovered by the vendee.

Where the contract itself provides what *shall be done* with the land in case the vendee fails to pay the instalments, the vendor cannot treat his failure to pay as a total rescission of the contract by the vendee.

In such case both parties are bound by its terms, and any rights which the contract gives to the vendee in the proceeds of the sale to be made by the vendor upon the vendee's failure to pay, are still reserved to the latter.

A grantee in a deed, absolute in form, though in fact intended as a mortgage, is, in the absence of any agreement to the contrary, liable as between himself and the grantor, to pay the taxes on the property accruing after the date of the deed.

A commission had been returned at the instance of the complainant, and after he had full opportunity to take his testimony. More than eight months thereafter, and after the case was ready for hearing, he applied to have the commission remanded to enable him to take further testimony. HELD:

That there was no error in refusing this application; there is no rule of equity practice that will justify the remanding of the commission under such circumstances.

43                    v. 52.

APPEAL from the Circuit Court for Prince George's County, in Equity.

The cause is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., BRENT, MILLER and IRVING, J.

*Henry E. Davis* and *C. C. Magruder*, for the appellant.

*William A. Meloy*, for the appellee.

MILLER, J., delivered the opinion of the Court.

It is conceded that the absolute deed of the 20th of October, 1873, by which Eben C. Ingersoll and wife conveyed the farm in Prince George's County to Davis, was intended and is to be treated as a mortgage from Hall to Davis. The bill filed by Davis alleges that Hall had purchased the land from Ingersoll, and had paid the whole of the purchase money therefor, but being indebted to Davis in the sum of $10,500, according to the terms of a certain agreement which had been executed between them in Washington City, he authorized and directed Ingersoll to convey the land to Davis in order to secure the payment of that debt. The prayer of the bill is that the deed may be decreed to be a mortgage, and the property sold for the payment of this debt, which is charged to be still due and unpaid. The agreement referred to in the bill as the foundation of the indebtedness of Hall to Davis was a certain contract between Davis of the first part and Hall and one Charles H. Holden of the second part, dated the 1st of March, 1873, the terms of which will be presently stated. When the deed from Ingersoll was executed, two instalments of $5000 each with interest had become due to Davis under this contract. One of the defences which

Hall sets up in his answer is, that the deed was executed solely upon the consideration that Davis would allow a postponement of the payment of one of these instalments, and that that instalment with all its incidents has been since fully paid and discharged. But the proof in the case, which we have carefully examined, fails to sustain this position. We think it is very clear that the deed was given as part security for all that was due to Davis under the contract at the time the deed was executed. In the view we have taken of the case it is not necessary to ascertain the exact amount of this indebtedness.

The other and main defence is, that after the execution of the deed thus given as collateral security, Davis himself made breach of the conditions of the contract on his part to be kept and performed, and altogether rescinded the same, refused to abide by it, and held it to be wholly null and void, and that he thereby released the collateral security of the deed, and thenceforth held and continues to hold the title of the land so conveyed to him free from all charge, and in trust to convey the same to Hall. This defence was sustained by the Court below, and a decree was passed in conformity with a prayer to that effect contained in the amended answer of the defendant, directing Davis to release and convey the land to Hall within a certain time, and in case of his neglect or refusal to do so, then that the decree itself shall stand as a release and conveyance thereof, and the title to the land shall be divested from Davis and vested in Hall, as fully as if the deed from Ingersoll and wife had been originally executed and delivered to Hall as the sole grantee therein. From that decree the present appeal is taken.

In reviewing this decree we must first consider the contract of the 1st of March, 1873, and ascertain whether the appellant had in fact abrogated or rescinded it, or had refused to be bound by its terms and conditions. It appears that Davis was the owner of about thirty-six acres

of land near the City of Washington which he desired to sell, and which Hall and Holden proposed to purchase. After some negotiations between them the land was surveyed, subdivided into blocks and lots for building purposes, with streets properly located, and a plat was made showing the location and subdivision of the property. The parties then entered into the contract in question under their hands and seals, the terms of which are substantially these:

1st. Davis agrees in consideration of the sum of $55,000 to be paid to him by Hall and Holden as follows, viz., $5000 with seven per cent. interest, on or before the 1st of June next, $5000 with like interest on or before the 1st of September next, and the remainder with like interest in six equal annual instalments, counting from the date of the contract, and on and after the performance and observance by them of the agreements and conditions hereinafter mentioned, to sell and convey this property to Hall and Holden in fee simple.

2nd. Davis further agrees at any time within six months after the date of this contract, to convey to Hall and Holden or their assigns, at their request and expense, any one or more of the lots in blocks Nos. 11, 12 and 13 in the plan of the property, upon and after the payment to him of $100 for each lot sold, and after the work of building *four* of the dwelling houses or cottages hereinafter mentioned, shall have been commenced.

3rd. It is then expressly agreed and provided that no deed or conveyance of the whole or remaining portion of the land or lots shall be given or demanded until after the sum of $15,000 shall have been paid to Davis, and until after the erection and completion of eighteen dwelling houses or cottages, each of the value of $1800, upon the lots in blocks 11, 12 and 13; and that upon the payment of said sum and the completion of said houses or cottages, Davis shall and will convey the whole or remain-

ing portion of the lands to Hall and Holden, upon his receiving at the same time a deed of trust thereof securing the unpaid purchase money.

4th. It is further agreed that Hall and Holden shall pay all the taxes on the land, and if they fail to do so and Davis shall pay the same, the amount thereof shall be considered as part of the purchase money, bear like interest, and be secured in like manner as a charge or lien on the land.

5th. "And it is hereby further agreed and expressly provided, that if at any time before the execution and delivery of the deed or conveyance of the whole or the remaining portion of said land, any default shall be made in any of the payments aforesaid of said purchase money, or any part of the said interest, as hereinbefore provided, then and thereafter it *shall be lawful and right* for the said Davis, his heirs or assigns, *to sell the said land or the remaining portion thereof, upon such terms, and after such public notice customary in public sales of real estate,* and to convey to the purchaser thereof in fee simple; and of the proceeds thereof, after paying all expenses of sale and retaining a reasonable commission for the same, to pay all of said payments then unpaid, with the interest thereon, whether due or not, and all amount, if any, paid for taxes as aforesaid, with the interest thereon, *to pay the remainder, if any, to said Hall and Holden, their heirs or assigns."*

6th. And Hall and Holden agree to make said payments with interest, at the times hereinbefore provided for the payments thereof, and that they will erect and complete said houses or cottages as hereinbefore provided, within six months from the date hereof, and that they will observe and perform all the provisions and conditions herein expressed.

It is manifest from an examination of this agreement, (which seems to have been very carefully prepared,) that

the parties intended, and that the contract itself provides, that a small portion of these lots should be sold by the vendees, and the title to them pass from the vendor, before a conveyance of the rest of the property should be made or demanded.   The evident purpose of this was to develop the property at once, and bring the rest of it to the favorable notice of purchasers, and thus enhance its value as well as secure its improvement and sale.   It is also very important to notice the fact that it provides in explicit and carefully guarded terms, what rights the vendor shall have, and what course he shall pursue in case of *any default* on the part of the vendees in payment of the purchase money according to its stipulations.   It contemplates the contingency of such default, and carefully provides what shall be done, and what rights shall thereupon arise and accrue to each party.   With this understanding of its purpose and provisions, we must inquire what was done under it, and which party is, in law, to be regarded as the one that has rescinded it, or refused to abide by its terms.   This must be ascertained and determined solely from the evidence contained in the record before us.   The testimony is very voluminous, is confused in its arrangement, and on some points is conflicting.   We have given it a patient and careful examination, and without reviewing it in detail, we shall simply state in general terms such facts material to the questions to be decided as, in our judgment, it establishes.

We find then, that after the date of this contract, a few of the lots were sold by the vendees, and deeds therefor were given to the purchasers by Davis, and that in some cases he received the $100 on such sales.   It is clear, however, that Hall and Holden failed to pay the instalments due on the first of June, and the first of September.   Davis then pressed for payment, and on the 20th of September, notified them by letter, that unless they paid on or before the 1st of November following, all arrears

then due, "the said agreement will be held *by me* as null and void, and I consequently discharged from *any obligation* thereunder," and that from the date of the letter, he would give no further deeds. To this, Hall replied by letter of the 29th of September, in which he proposes the Prince George's farm as security, which he says cost him $10,000, and Holden, by a letter of the 30th of September, proposes to settle by the assignment of various collaterals, being chiefly amounts alleged to be due by parties to whom sales of lots had been negotiated. The deed of the Prince George's land was then executed on the 20th of October, 1873, for the purpose we have before stated. After this, some other collaterals were passed to Davis by Hall and Holden, but were not received by the former as absolute payment for their face value, but to be collected by him, and the proceeds applied to the indebtedness under the contract. Upon these some money was eventually realized by Davis, but very little in comparison with what was then due him. Hall and Holden then endeavored to, and did in fact, effect the organization of an *unincorporated* Association, called the "Cottage Hill Company," for the purpose of purchasing this property, and negotiations with Davis were had for the purpose of effecting a settlement on the basis of a purchase by this Association. In a letter to him of the 28th of February, 1874, their inability to meet the payments under the contract is plainly admitted, and they request an extension of time, and that he would if possible accede to the terms of purchase proposed by this Company, of which he was aware. But the proposed sale to this unincorporated Association was never assented to by Davis, and on the 1st of March, 1874, when the first *annual* instalment provided for in the contract became due, he addressed a written notice to Hall and Holden, to the effect that unless they complied with the contract, and made the payments then due under it, he would treat the contract from the

9th of that month as *null and void,* and would have nothing further to do with them in the matter of that contract. The original notice seems to have been lost, but its contents are clearly proved, and Davis himself, in his testimony, admits that he sent such a notice to them. Afterwards, on the 3rd of April, 1874, a Company by the name of the "Cottage Hill Company," was duly incorporated. With this Company, Davis, in total disregard of the terms of his contract with Hall and Holden, as to his power to sell, negotiated a *private sale* of the property in question, and on the 9th of April, 1874, entered into a written contract by which he agreed to sell to them his "*remaining title and interest*" in the property for the sum of $62,200, to be paid in the manner therein specified. The preponderance of evidence clearly shows that while Hall and Holden were interested in, and the former was an officer of, the previous unincorporated Association of the same name, they were neither corporators, officers, stockholders, nor in any way interested in the subsequently incorporated Company. In the contract with this corporation, no mention is made of the previous contract with Hall and Holden, and there is no acknowledgment of any rights of theirs under it, nor does it profess that the sale which it effects was made in pursuance of any power of sale contained in, or provided for by the first contract. On the contrary, it contains a stipulation that the vendee corporation shall not be held responsible in any mode or manner, for any liabilities that may have accrued by reason of parties having any claims or alleged claims against Davis or the property referred to, and Davis covenants and agrees with the corporation to save it harmless from any demand whatever of such claimants or alleged claimants. It also contains an agreement giving permission to Davis to subscribe for ten shares of the stock of the Company to be credited on the purchase money. It has been contended that this sale was made at

the instance and with the assent of Hall and Holden, and Davis so testifies in this case. But in this we think he is mistaken. He is not only contradicted by the testimony both of Hall and Holden, but in May, 1874, just after this sale was made, they filed a bill against him in the Supreme Court of the District of Columbia, in which they set up their rights under the original contract, and charge, among other things, that after they had found a purchaser for the property at a highly advantageous price, Davis intervened and sold the property to this corporation, by which sale they aver, that he, *at their election*, became their trustee, and liable to account with them for the proceeds of such sale. In his sworn answer to this bill, Davis admits the sale, and avers that after they had notified him of their inability to meet the payments under their contract, his only safe course was to *rescind it*, and make sale of the premises to the best advantage he could. After testimony had been taken, the equity Court passed a decree dismissing the bill with costs, and on appeal that decree was affirmed without prejudice.

It seems to us therefore, plain from the facts thus found, that the vendor is the party who must be regarded as having rescinded this contract and refused to abide by its terms and conditions. True, default was made by the vendees in payment of the instalments of purchase money as they became due, and if the contract had been silent as to what should then be done by the vendor, and what rights should then accrue to each party, it may be that he could have treated such default as a rescission by them, and have sold the property as he afterwards did, and still have held on to the money or securities he had received from the vendees under it. The appellant's counsel have cited the cases of *Ketchum & Sweet vs. Evertson*, 13 *Johns.*, 359, and *Battle vs. The Rochester City Bank*, 5 *Barb.*, 414, as sustaining his right to hold on to and enforce this mortgage. But those cases are widely different from the one

before us. In the former there was simply a contract for the sale of land, the purchase money to be paid in instalments. The vendee paid the first instalment, and then refused to complete the contract and left the premises. The vendor afterwards sold the property to another party, and the vendee then brought *assumpsit* to recover back what he had paid. The Court held that a party who has advanced money or done an act in part-performance of an agreement, and then stops and refuses to proceed to the ultimate conclusion of the agreement, the other party being ready and willing to proceed and fulfil all his stipulations according to the contract, has never been suffered to recover for what has been thus advanced or done. "The plaintiffs," say the Court, "are seeking to recover the money advanced on a contract, every part of which the defendant has performed, as far as he could by his own acts, when they have voluntarily and causelessly refused to proceed, and thus *have themselves rescinded the contract.* It would be an alarming doctrine to hold that the plaintiffs might violate the contract, and because they chose to do so, make their own infraction of the agreement the basis of an action for money had and received." The latter case was of like character, save that the contract provided that on failure to pay the instalments it should become void if the vendor should elect to rescind it. The Court held that this clause merely expressed what the law would have adjudged without it, and denied the right to recover, for the reasons stated in the preceding case. In neither of these cases was there any clause in the contract reserving any right or interest to the vendee in case of his default, and the decisions rest entirely upon the ground that it was by his fault that the rescission took place, or in other words, that he in fact was the party who had rescinded. But in the present case, as we have seen, the contract provides what rights each party shall have in case of default by the vendees. All rights and inte-

Davis *vs.* Hall.

rests, of the latter are not stricken down by their default in paying the instalments of the purchase money. On the contrary, in that event it is by this agreement only made lawful and right for the vendor to sell the property after public notice, and then he is bound to apply the proceeds first to the payment of what is due him, and the balance if any to the vendees. They have thus secured to them an interest in the sale and in the application of the proceeds. The sale made by the vendor has been made in violation of the terms of this stipulation, and he has denied and repudiated its obligation. He is therefore the party who has rescinded the contract, and standing in this attitude, it would be against equity and conscience to allow him to hold on to this mortgage security. The case clearly falls within the general rule that a party cannot rescind a contract and at the same time hold on to the consideration in whole or in part which he has received under it.

The appellant then not being entitled to hold on to this land as security for the overdue instalments of purchase money, (the sole purpose for which the deed conveying it was executed,) does the record show that he has any other equitable interest therein? It is insisted first, that he should be allowed to retain the farm until he has been reimbursed the amounts he paid for examining the title and for taxes since the date of the deed. But it is clear, we think, that Hall made no contract and was under no obligation to pay either of these charges. The examination of the title was evidently made at the instance of Davis himself, and consequently at his own cost, and the deed being absolute on its face the legal obligation to pay the taxes rested on him. Besides this, the form of the deed gave him the right of possession, and the right to receive the rents and profits of the land if he chose to exercise it. Another alleged equity arises in this way. Though the bill charges that Hall had paid the whole purchase money

due Ingersoll for this farm, yet the testimony shows that the latter claimed there was $1000 still due him, and refused to execute the deed until he had received a conveyance of three of the lots referred to in the contract. Such conveyance was made by Davis at the instance and request of Hall, and the former now claims he should, before giving up the farm, be paid the sum of $100 for each of these lots, that being the sum he was entitled to receive under the terms of the contract. But if it should be conceded he can set up this equity in the face of the averments of his bill we are of opinion an answer to it is found in the fact, which we think the testimony establishes, that he has received already from *other collaterals* applicable to these overdue instalments, a sum much larger than the $300 due for these lots, and, indeed, a sum quite sufficient to cover this amount and also the amount he has paid for taxes. We therefore discover no equitable ground under which the appellant can longer retain the title to this farm.

It appears that the Court below refused an application of the appellant to remand the commission in order to enable him to take further testimony. Assuming, without however so deciding, that the order refusing this application, is the subject of review on appeal from the final decree, we are clearly of opinion the application came too late and was properly rejected. The bill was filed on the 14th of November, 1876, and this application was not made until the 20th of January, 1879, the commission having been closed and returned on the 10th of May, 1878. The complainant was afforded ample time and opportunity to take all the testimony he desired, and the original answer, as well as the course of the testimony itself, fully apprised him of the defences relied on and of what he would have to prove to make out his case. Beside this, he was himself all the while complaining of delay on the part of the defendant in taking testimony, and in fact

Davis *vs.* Hall.

obtained from the Court more than one order for the return of the commission. We know of no rule of equity practice that would under such circumstances justify the granting of his application.

It is hardly necessary to say that the manuscript copy, produced before us during the argument by the appellee's counsel, of certain testimony which appears to have been taken in the equity case in the District Court, cannot be received or considered by this Court as forming part of the testimony in this case. It was not taken under the commission and forms no part of the record of the equity cause which was offered in evidence. It seems to have been attached to the return of the commission without authority, and is not embodied in the record. We have however examined that testimony, and even if it were properly before us as part of the testimony in the case, it would not in any wise change the conclusions we have reached and the views we have expressed.

. The result therefore is that the decree appealed from must be affirmed.

*Decree affirmed.*

(Decided 9th January, 1880.)